Jane DOE, a Minor, By and Through her Guardian ad Litem, John DOE, Plaintiff,

v.

PETALUMA CITY SCHOOL DISTRICT, and Petaluma Joint Union High School District, Richard Homrighouse, and Roes 1 through 50, Inclusive, Defendants.

No. C 93–00123 CW.

United States District Court, N.D. California.

July 22, 1996.

Rose B. Fua, Equal Rights Advocates, San Francisco, CA, John J. Steele, Fenwick & West LLP, Palo Alto, CA, Julie Goldscheid, Yolanda S. Wu, NOW Legal Defense and Education Fund, New York City, for Jane Doe.

MaryClare Lawrence, Conner Slabach Lawrence & Rodney, Santa Rosa, CA, for John Does.

Scott N. Kivel, Larry Frierson, Liebert Cassidy & Frierson, San Francisco, CA, Robert J. Henry, School And College Legal Svcs., Sonoma Cty. Office of Educ., Santa Rosa, CA, for Petaluma City School District, Petaluma Joint Union High School District, Dick Cleclak, Richard Homrighouse, Kenilworth Junior High School.

Susan L. Kamlet, U.S. Attorney's Office, Oakland, CA, Juliette N. Kayyem, U.S. Department of Justice, Civil Rights Division, Washington, DC, for the U.S.

## ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION

WILKEN, District Judge.

Plaintiff's Motion for Reconsideration was heard by this Court on April 26, 1996. Having considered the papers filed by the parties and oral argument on the motion, and good cause appearing, the Court hereby GRANTS the motion as follows.

### BACKGROUND

Plaintiff filed this action on January 11, 1993 alleging that Defendants failed to stop sexual harassment inflicted on her by her peers while she was a student at Kenilworth Junior High School. On August 30, 1993, on Defendants' motion to dismiss the First Amended Complaint, this Court, the Honorable Eugene F. Lynch presiding, held that Title IX, 20 U.S.C. §§ 1681 *et seq.*, prohibits hostile environment sexual harassment, and that money damages are available in a private action to enforce Title IX upon proof of "intentional discrimination on the basis of sex by an employee of the educational institution." *Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560, 1571 (N.D.Cal.1993)[1] (*"Petaluma I"*).

The Court specified that, in proving intentional discrimination, "it is not enough that the institution knew or should have known of the hostile environment and failed to take appropriate action to end it," because that standard, applicable to Title VII claims for sexual harassment in the workplace, was not "the equivalent of 'discriminatory animus,'" but rather was "in essence a negligence standard." *Id.* The Court explained what Plaintiff would be required to prove under its ruling as follows:

> [T]he school district must be found to have intentionally discriminated against the plaintiff student on the basis of sex. The school's failure to take appropriate action, as alleged in plaintiff's complaint, could be circumstantial evidence of intent to discriminate. Thus a plaintiff student could proceed against a school district on the theory that its inaction (or insufficient ac-

---

1. Citation services disagree regarding the subsequent history of this case. A ruling from a later proceeding on an amended complaint was re-versed by *Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447 (9th Cir.1995).

tion) in the face of complaints of student-to-student sexual harassment was a result of an actual intent to discriminate against the student on the basis of sex.

*Id.* at 1576.

On March 11, 1996, the Court granted Plaintiff leave to move for reconsideration of the above order pursuant to Civil Local Rule 7–9(a) in light of the developing case authority in this rapidly changing area of the law.

*DISCUSSION*

### 1. Standard for Reconsideration

 Reconsideration should be granted only where there has been an intervening change of law or fact, new evidence or authority not previously available in the exercise of reasonable diligence has been discovered, or reconsideration is necessary to correct a clear error of law or a manifest injustice. *School Dist. No. 1J, Multnomah County v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993) *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994); Civil L.R. 7–9(b). As this Court noted in its order of March 11, 1996 granting leave to move for reconsideration, several new cases on school district liability under Title .IX for student-on-student harassment have been decided since this Court's order of August 30, 1993. In addition, there is new authority in related areas of discrimination law, including Title VII law, which are informative here. As the Ninth Circuit explicitly recognized in 1991, "sexual harassment is a rapidly expanding area of the law." *Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991). This remains as true today as it was five years ago.

Defendants argue that this Court should refrain from reconsidering its prior decision under the doctrine of the law of the case. However, as Defendants recognize, "law of the case" refers only to the practice of courts not to reopen a decided issue except for a cogent reason, and does not circumscribe a court's authority to reconsider an interlocutory ruling when good cause exists to do so. *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). Good cause exists here to reexamine the issues raised in this case.

### 2. Intentional Discrimination

 At issue in this motion is the standard of liability for damages under Title IX applicable to a federally funded school district when a sexually harassing hostile environment in a school allegedly harms a student. The availability of the remedy of money damages for violation of Title IX is based on the Supreme Court's decision in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The issue therefore turns on what the Supreme Court meant when it held that monetary damages could be awarded under Title IX against a recipient school district, consistent with the limitations on Spending Clause statute remedies, in cases of "intentional discrimination." *Id.* at 74–75, 112 S.Ct. at 1037.

In *Franklin,* the alleged hostile environment arose from the sexual harassment of a student by her teacher. The plaintiff sued the school district for damages under Title IX, claiming that the school district intentionally discriminated against her. The complaint alleged that a teacher engaged in ongoing sexual harassment and abuse, and that other teachers and administrators, although they were aware of the harassment, took no action to halt it. The district court dismissed the complaint on the grounds that Title IX does not authorize damages, and the appellate court affirmed.

The Supreme Court reversed, relying on the general presumption that where legal rights are violated and a federal statute provides for a general right to sue for the violation, the federal courts may use any available remedy to right the wrong. *Franklin,* 503 U.S. at 66, 112 S.Ct. at 1032–33. The defendant argued that this presumption should not apply because Title IX was enacted pursuant to Congress' Spending Clause power. The Court rejected this argument, noting that while in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28–29, 101 S.Ct. 1531, 1545–46, 67 L.Ed.2d 694 (1981), the Court had limited remedies for unintentional violations of statutes promulgated under the Spending Clause statutes, this principle did not apply to intentional violations. *Id.* at 74, 112 S.Ct. at 1037. The Court

explained that the reason not to permit monetary damages for an unintentional violation is that the recipient of federal funds lacks notice that it will be liable for a monetary award. *Id.* In contrast, however,

> This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64 [106 S.Ct. 2399, 2404, 91 L.Ed.2d 49] (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student.

*Id.* at 74–75, 112 S.Ct. at 1037. Therefore, the Court held, a damages remedy was available against the school district.

The *Franklin* Court did not define or analyze "intentional discrimination." It was clear enough that a claim of "intentional discrimination" was at issue there, in that the plaintiff specifically alleged "intentional discrimination" and the lower courts characterized the plaintiff's claim as one of "intentional discrimination."

Thus, it is not clear how the Court meant the "intentional discrimination" standard it set in *Franklin* to relate to the standard for liability for hostile work environment sexual harassment under Title VII. The Court gave conflicting signals on this point. On one hand, the *Franklin* Court expressly refused to consider whether the standards and remedies of Title VII should be directly applied to Title IX cases. 503 U.S. at 65, n. 4, 112 S.Ct. at 1032 n. 4. On the other hand, in characterizing the plaintiff's claim as one for "intentional discrimination," the Court cited without explanation to `Meritor Savings Bank, FSB v. Vinson,` 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a hostile environment case arising under Title VII. 503 U.S. at 75, 112 S.Ct. at 1037–38.

To further complicate matters, the *Meritor* Court had held that employers are not "always automatically liable for sexual harassment by their supervisors" and instructed the lower courts to look to agency principles for guidance in formulating a rule on employer liability. 477 U.S. at 72, 106 S.Ct. at 2407–08. Yet the *Franklin* Court, while relying on *Meritor,* made no mention of agency principles and gave no explanation of the connection between the act of the teacher in sexually harassing a student, which it characterized as intentional discrimination, and the liability of the school district for intentional discrimination.

■ The *Franklin* Court must have been aware that the appellate courts had fashioned a test for Title VII employer liability pursuant to the Court's instructions in *Meritor.* Under that test, an employer is liable for the existence of a hostile environment in its workplace only if the employer failed to take prompt remedial action after the employer actually knew or should have known of the existence of the hostile environment. *See, e.g., EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989). The facts alleged in *Franklin* would have met that test, for the plaintiff alleged that teachers and administrators actually knew of the harassment in the school but failed to do anything to remedy it. However, the *Franklin* Court did not refer to or expressly rely upon that knowledge and inaction when characterizing the plaintiff's claim as one for intentional discrimination.

Yet another layer of uncertainty is imposed by the context in which the *Franklin* Court raised the concept of intentional discrimination. That context was a discussion of whether the recipient district had sufficient notice of its potential liability to warrant imposition of money damages under a Spending Clause statute. The Supreme Court had previously held in a Title VI action, under the principle expressed in *Halderman,* that monetary damages should not be awarded under Title VI for unintentional disparate impact discrimination. *Guardians Ass'n v. Civil Serv. Comm'n of New York,* 463 U.S. 582, 597, 103 S.Ct. 3221, 3229–30, 77 L.Ed.2d 866 (1983) (layoffs based on facially neutral "last-hired, first-fired" policy, which had disparate impact due to facially neutral entry examinations did not support money damages under Title VI). Justice White,

announcing the judgment of the Court,[2] explicitly noted that the holding that damages were not available for unintentional discrimination based on disparate impact left open the issue of whether money damages would be appropriate in cases of "intentional discrimination." *Id.* Thus, while not explicitly defining "intentional discrimination," Justice White implied that it is discrimination other than that based on disparate impact. This section of Justice White's opinion was joined by Justice Rehnquist.

In addition, the dichotomy between intentional discrimination and discrimination based on disparate impact was also implicit in the concurrences and dissents of Justices O'Connor, *id.* at 613, 103 S.Ct. at 3238, Marshall, *id.* at 616, 103 S.Ct. at 3240, and Stevens, Brennan and Blackmun, *id.* at 645, 103 S.Ct. at 3255. Thus, a majority of the *Guardians* Court impliedly defined "intentional discrimination" as discrimination other than disparate impact discrimination. However, it is not clear whether the *Franklin* Court intended the phrase "intentional discrimination" to have the same meaning as that same phrase in the *Guardians* Court's intentional discrimination/disparate impact dichotomy.

This Court, in its order of August 30, 1993, now under reconsideration, was acutely aware of the lack of clarity in *Franklin* regarding the relationship between the intentional discrimination standard used there and the Title VII standard for hostile environment claims. This Court resolved the conflicting clues by determining that the Title VII standard was inapplicable to a Title IX claim, and that in its place was a requirement for actual discriminatory animus on the part of an agent of the school district:

> Although the *Franklin* Court refused to address the question of whether Title IX's

prohibitions and remedies are co-extensive with Title VII's, the implication of the Court's opinion is that they are not. Although not expressly stated in the opinion, the rule laid down by *Franklin* appears to be that, under Title IX, damages are available only for intentional discrimination but *respondeat superior* liability exists, so that an institution is deemed to have intentionally discriminated when one of its agents has done so.

*Petaluma I,* 830 F.Supp. at 1575.

It must be noted that the *Petaluma I* test is in some cases more stringent, and in other cases more lenient, than the Title VII standard for entity liability for hostile environment. In the case of intentional harassment by a non-supervisory agent of the entity, strict liability would be imposed on the institution under the *Petaluma I* test, while liability would not be imposed under Title VII in the absence of the entity's knowing failure to remedy the harassment. On the other hand, in the case of harassment by a non-agent, liability would be imposed under Title VII whenever the entity knowingly failed to remedy the harassment, while liability would be imposed under the *Petaluma I* test only if the failure to remedy is caused by the discriminatory animus of an agent of the entity.

Since this Court issued its ruling in *Petaluma I,* several other courts have examined the standard to be applied in Title IX peer harassment hostile environment cases. The approaches taken have varied. That which most closely resembles this Court's approach in *Petaluma I* is found in *Bosley v. Kearney R–1 School District,* 904 F.Supp. 1006 (W.D.Mo.1995).

The *Bosley* court found, as had this Court, that intentional discrimination on the part of the district is a required element of a claim

2. There was no majority opinion due to the split of opinions on the issues presented. Justice White concluded, as did Justice Marshall, that the appellate court erred in requiring proof of discriminatory intent to establish a violation of Title VI; Justices Stevens, Brennan and Blackmun also found error in this requirement, reasoning that while Title VI itself requires intentional discrimination, the regulations promulgated thereunder incorporating a disparate impact standard are valid. However, Justice White concluded, as did Chief Justice Burger and Justices Powell, Rehnquist and O'Connor, that the judgment of the appellate court should nevertheless be affirmed. Justices White, Rehnquist and O'Connor reached this conclusion on the ground that compensatory relief is not available under Title VI in the absence of discriminatory intent, Justice Powell and Chief Justice Burger on the ground that there is no private right of action under Title VI.

for damages, holding that "plaintiff must show that the school district selected a particular course of action in response to her complaints of sexual harassment at least in part 'because of' plaintiff's sex." *Id.* at 1021. However, the *Bosley* court held that Title VII provides the most appropriate standard for enforcing the anti-discrimination provisions of Title IX. The *Bosley* court slightly modified the Title VII standard for entity liability, raising the test of "knew or should have known of the hostile environment and took no or insufficient remedial action," *id.* at 1023 (citing *Murray v. New York University College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995)) (employer liability standard), to "knew of the harassment and intentionally failed to take proper remedial action." *Id.* 904 F.Supp. at 1023.

The *Bosley* court specified that the required intent could be established by inference. *Id.* at 1021. Thus, upon a showing that the plaintiff was subjected to harassment based on sex while participating in an educational program, and that the school district knew of the harassment and failed to take appropriate remedial action, the trier of fact could infer that the failure to take remedial action constituted intentional discrimination. *Id.* at 1025.

The Eleventh Circuit, in *Davis v. Monroe County Board of Education*, 74 F.3d 1186 (11th Cir.1996), took a different approach. Like the *Bosley* court, that court found that Title VII principles should be applied in Title IX cases. However, unlike the *Bosley* court, it perceived no need to modify the Title VII standard for liability on the part of an entity. The *Davis* court discerned in *Franklin*'s holding an intent to provide students with the same level of protection in school as employees have in the workplace. *Id.* 74 F.3d at 1192–93, citing *Franklin*, 503 U.S. at 74–75, 112 S.Ct. at 1037–38. The *Davis* court found the extension of Title VII's substantive standards appropriate in light of the Supreme Court's mandate that Title IX be read broadly, *North Haven Board of Education v. Bell*, 456 U.S. 512, 521, 102 S.Ct. 1912, 1917–18, 72 L.Ed.2d 299 (1982), and the Office of Civil Rights' use of Title VII standards in interpreting and enforcing Title IX.

*Davis*, 74 F.3d at 1190, 1192. The *Davis* court perceived public policy reasons for ensuring that schoolchildren receive at least as much protection as workers:

> Indeed, where there are distinctions between the school environment and the workplace, they "serve only to emphasize the need for zealous protection against sex discrimination in the schools." The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace, as students look to their teachers for guidance as well as for protection. The damage caused by sexual harassment also is arguably greater in the classroom than in the workplace, because the harassment has a greater and longer lasting impact on its young victims, and institutionalizes sexual harassment as acceptable behavior. Moreover, as economically difficult as it may be for adults to leave a hostile workplace, it is virtually impossible for children to leave their assigned school. Finally, "[a] nondiscriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that a student receives. A sexually abusive environment inhibits, if not prevents, the harassed student from developing her full intellectual potential and receiving the most from the academic program."

*Id.* at 1193, quoting *Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F.Supp. 1288, 1292–93 (N.D.Cal.1993). Thus, *Davis* required no showing beyond that necessary under the Title VII standard to demonstrate the requisite intentional discrimination to support money damages against the entity.

The Fifth Circuit takes a wholly opposite view from that of the Eleventh Circuit, holding that not only must discriminatory intent on the part of the school district be specifically shown, but that it can be shown only by demonstrating that "the school district responded to sexual harassment claims differently based on sex." *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1016 (5th Cir.1996). Under the *Rowinsky* approach, it is not enough that the school district intentionally permits an environment hostile to girls to exist and continue; rather, a school

district may be held liable only if it affirmatively treats girls' complaints differently than boys' complaints. *Id.*

This Court rejects the *Rowinsky* approach, because it yields extreme results inconsistent with the body of discrimination law. Under the *Rowinsky* approach, if harassment exists only against girls, such that there are no complaints by boys providing a comparison point for the treatment of girls' complaints, girls are necessarily deprived of a remedy, even if the sexually hostile environment is extremely severe and pervasive, the school district actually knows of the hostile environment, and the district fails to take any action whatever to remedy it. Moreover, that would be so even if the school district's inaction was directly caused by discriminatory animus.

Moreover, *Rowinsky* is manifestly based on a fundamental misunderstanding of the nature of this type of claim. The majority opinion continually refers to the plaintiff's claim as being based on the conduct of the peer harassers rather than on the action and inaction of the school district, and its reasoning is based upon this characterization. Thus the court holds that "[i]mposing liability for the acts of third parties would be incompatible with the purpose of a spending condition," *id.* at 1013, and that the legislative history demonstrates that the statute was directed exclusively "to the practices of grant recipients." *Id.*

The actual thrust of this type of claim, is to impose liability on the school district based not on the harassing conduct of its students, but on the district's *own* conduct of knowingly permitting the discriminatory hostile and abusive environment to continue and to inflict an ongoing injury on its female students. *Rowinsky* does not recognize that inaction may constitute actionable discrimination. *See Bator v. State of Hawaii,* 39 F.3d 1021, 1029 (9th Cir.1994) ("a supervisor who has been apprised of unlawful harassment ... should know that her failure to investigate and stop the harassment *is itself unlawful*" under the Equal Protection Clause) (emphasis added). This Court accordingly can take no guidance from the *Rowinsky* decision.

The Court does find persuasive the *Bosley* and *Davis* courts' decision to utilize Title VII standards and principles in Title IX cases. The appropriateness of using Title VII substantive standards in Title IX employment cases is by now well established. *See, e.g. Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 206 (4th Cir.1994); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896–97 (1st Cir. 1988); *Mabry v. State Bd. of Community Colleges and Occupational Educ.,* 813 F.2d 311, 316 n. 6 (10th Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). As the *Lipsett* court explained in a well-reasoned decision, borrowing the Title VII standard in Title IX employment actions is justified by the fact that Title VII and Title IX both prohibit the identical conduct of sex discrimination and by the legislative history of Title IX, which demonstrates the legislative intent to remove Title VII's exemption of educational institutions and bring employees of educational institutions within the scope of equal employment protection. 864 F.2d at 896–97.

The circuit courts have also looked to Title VII's substantive standards in Title IX actions brought by students. *See, e.g., Murray,* 57 F.3d at 248; *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 832 (10th Cir.), *cert. denied,* 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993); *but cf. Cohen v. Brown Univ.,* 991 F.2d 888, 901 (1st Cir. 1993) (declining to apply Title VII burden-of-proof-shifting procedure to Title IX claim, which is "a loosely laced buskin, inhospitable to the specialized choreography of presumption and production upon which the *Burdine/McDonnell Douglas,* burden-shifting framework depends").

■ This Court agrees with the above authority that Title VII is the most useful and appropriate analogue in Title IX cases. The Court further agrees with the analysis of the *Davis* court that sound public policy supports applying Title VII standards to student actions as well as employee actions under Title IX, without weakening the standards as applied to the students. In addition, this Court discerns in Title IX no intent to provide a

lesser degree of protection to students than to employees.

With the benefit of hindsight, it now appears that the *Davis* approach most closely carries out the *Franklin* holding. While the Supreme Court's use in *Franklin* of the phrase "intentional discrimination" was ambiguous, its later use of that phrase in the context of Title VII hostile environment discrimination has clarified its meaning.

*Landgraf v. USI Film Products*, 511 U.S. 244, 281–82, 114 S.Ct. 1483, 1506, 128 L.Ed.2d 229 (1994), is a Title VII case involving a peer co-worker's sexual harassment and an immediate supervisor's failure to remedy the harassment. The Court examined the 1991 amendments to Title VII which permit recovery of compensatory damages against employers who violate Title VII. Those amendments set up the same dichotomy as did the Supreme Court in *Franklin* and *Guardians* for they limit the award of money damages to cases involving "intentional discrimination." While the amendments contain no formal definition, they appear to define intentional discrimination as any form of discrimination other than "an employment practice that is unlawful because of its disparate impact." 42 U.S.C. § 1981a(a)(1).

In *Landgraf*, the Supreme Court premised its discussion of whether these amendments should be given retrospective application on the assumption that a hostile work environment based on co-worker harassment would support monetary damages against the employer under these amendments. *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1489. The Court's discussion reveals that this assumption is based on its own characterization of such hostile environment discrimination as a form of intentional discrimination. For example, the Court states that the amendment "confers a new right to monetary relief on persons like petitioner who were victims of a hostile work environment but were not constructively discharged." *Id.* at ——, 114 S.Ct. at 1506. The Court's discussion demonstrates that the it assumes that the term "intentional discrimination" as used in the statute includes hostile environment sexual harassment. This is a persuasive indication that the Court's reference to "intentional dis-

crimination" in *Franklin* was similarly intended to include sexual harassment.

As this Court has noted in its previous orders, some language in Ninth Circuit authority could be read to suggest that the standard developed by the courts for finding liability in Title VII hostile work environment cases is not an intentional discrimination standard. Upon careful review of the hostile work environment case law, the Court concludes that the hostile work environment cause of action developed as a species of intentional discrimination, and that the Ninth Circuit authority which could be interpreted as holding otherwise should not be so interpreted.

This analysis begins with a brief overview of the two commonly used theories for proving Title VII violations, the disparate treatment theory and the disparate impact theory. Unlawful disparate treatment occurs when an employee treats an employee or employees less favorably than others because of the employee's membership in a group protected by Title VII. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish disparate treatment, a plaintiff must prove intentional discrimination, *id.*, whether by direct evidence or by inference under the test developed in *McDonnell Douglas*. Unlawful disparate impact occurs when a facially neutral employment practice affects more harshly a group protected by Title VII than on others and cannot be justified by a business necessity. *Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15; *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). A disparate impact plaintiff need not prove intentional discrimination; indeed, the employer's motive may be as innocent as the desire to hire the most qualified person. *Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15; *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853. Thus, for example, even subjectively good faith use of objective criteria such as education requirements, if not justified by business necessity, may be unlawful under the

disparate impact theory. The adverse affect on the protected class constitutes the discrimination, without any intent to single out any person or group of people because of their membership in that protected group.

The Title VII standard for sexually hostile work environment, as it has been developed by the courts, requires a plaintiff to prove (1) that she was subject to unwelcome harassment because of her gender, (2) that the harassment was sufficiently severe or pervasive to create an abusive work environment, and (3) that there is a basis for employer liability. *E.g., EEOC v. Hacienda Hotel*, 881 F.2d at 1514–15. This standard more closely resembles the standard under the traditional disparate treatment theory than that under the disparate impact theory.

The first prong of the hostile environment standard, like the disparate treatment standard, requires that the victim of the discrimination be singled out for adverse treatment by the harasser because of her membership in a group protected by Title VII. In contrast, the disparate impact test is wholly inapplicable to this prong, because the harassing conduct cannot be seen as facially neutral, and it would be absurd to inquire into any business necessity for it.

The third prong of the hostile environment test also contains a requirement of culpability with respect to the employer. The employer is liable for failing to remedy or prevent a hostile environment only if its management knew, or in the exercise of reasonable case should have known, of the existence of the hostile environment. *Id.* at 1515–16. The element of intent is less obvious in this prong than in the first prong of the standard. However, in *Hacienda Hotel*, adopting the "knew or should have known standard," the Ninth Circuit apparently intended the standard to be an intentional discrimination standard rather than a negligence standard. This is demonstrated by the court's citation to and reliance on *Hunter v. Allis–Chalmers Corp., Engine Division*, 797 F.2d 1417, 1421–22 (7th Cir.1986), in support of the "knew or should have known" standard. ·

*Hunter* was decided under 42 U.S.C. § 1981.[3] Accordingly, the claim required proof of intentional discrimination. *See, e.g., Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir.1985); *Vasquez v. McAllen Bag & Supply Co.*, 660 F.2d 686 (5th Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3509, 73 L.Ed.2d 1384 (1982); *Craig v. Los Angeles County*, 626 F.2d 659 (9th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981). Applying an intentional discrimination standard, the *Hunter* court found that "failure to take reasonable steps to prevent a barrage of racist acts, epithets, and threats can make an employer liable if management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment." 797 F.2d at 1421. The *Hunter* court made clear that such liability was not based upon the doctrine of *respondeat superior*. *Id.* Rather, the employer's liability is based on its own blameworthiness in failing to use reasonable care to prevent harassment in the workplace when the employer "has reason to know" of the harassment. *Id.* at 1422.

Other early hostile environment cases similarly demonstrate the courts' categorization of these claims as disparate treatment claims. For example, in *Henson v. City of Dundee*, 682 F.2d 897, 902–04 (11th Cir.1982), the court explicitly treated the hostile work environment claim as a disparate treatment claim which required a showing of intentional discrimination. The court held that because the "essence of a disparate treatment claim" is a showing that a person is "intentionally singled out for adverse treatment on the basis of a prohibited criterion," a hostile work environment plaintiff must show that "but for the fact of her sex, she would not have been the object of harassment." However, the court noted, the intent need not be proved under the *McDonnell Douglas prima facie* case framework because, unlike other species of claimed disparate treatment, cases of sexual harassment creating a hostile environment do "not present a factual question of intentional discrimination which is at all elusive." *Id.* at 905 n. 11. *Accord, Andrews v. City of*

---

**3.** *Hunter* was originally brought under both Title VII and 42 U.S.C. § 1981, but the Title VII claim was abandoned, and the case was decided exclusively under § 1981.

*Philadelphia*, 895 F.2d 1469, 1482 n. 3 (3d Cir.1990) ("[t]he intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course").

These two elements of intent, the harasser's intentional disparate treatment based on gender and the employer's act of implicitly condoning that disparate treatment by knowingly failing to take steps to remedy it, are included within the elements of hostile work environment discrimination required under Title VII. Thus hostile environment sexual harassment is a type of intentional discrimination, but the intent is established by proof of the elements required to prove the cause of action and needs no additional proof.

This background explains why the recent cases under the 1991 amendments to Title VII simply characterize hostile work environment discrimination as a species of intentional discrimination, without discussion. *See, e.g., Townsend v. Indiana Univ.*, 995 F.2d 691 (7th Cir.1993); *Raney v. District of Columbia*, 892 F.Supp. 283 (D.D.C.1995); *Sassaman v. Heart City Toyota*, 879 F.Supp. 901 (N.D.Ind.1994); *Splunge v. Shoney's, Inc.*, 874 F.Supp. 1258 (M.D.Ala.1994); *Preston v. Income Producing Management, Inc.*, 871 F.Supp. 411 (D.Kan.1994); *Meadows v. Guptill*, 856 F.Supp. 1362 (D.Ariz.1993); *Powell v. Las Vegas Hilton Corp.*, 841 F.Supp. 1024 (D.Nev.1992). If there was ambiguity regarding whether hostile environment claims were a species of intentional discrimination, this ambiguity has now been resolved by virtue of the 1991 amendments and the case law applying those amendments.

This Court previously noted that *Sischo–Nownejad v. Merced Community College District*, 934 F.2d 1104 (9th Cir.1991), could be interpreted to suggest otherwise. There the Ninth Circuit stated in *dicta* that there are three distinct theories for proving Title VII violations:

A plaintiff may show violations of these statutes by proving disparate treatment or disparate impact, or by proving the existence of a hostile work environment. Dis-

parate treatment involves intentional discrimination. Disparate impact involves a facially neutral employment criterion that has an unequal effect on members of a protected class; discriminatory intent need not be proved. A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class.

*Id.* at 1109 (citations omitted). This discussion appears to state that hostile work environment is a different species of violation, not subsumed within the category of "disparate treatment." However, in contrast to the specific statement that no intent is necessary for a disparate impact claim, nowhere does *Sischo–Nownejad* state that intentional discrimination is not an element of the hostile environment violation. Rather, the statement of the hostile work environment standard clearly contains the key element of intentional discrimination of singling out the victim because of her membership in a protected group. Further, in directly comparing traditional disparate treatment and hostile work environment, the only distinction the court made between these two types of claims was that traditional "disparate treatment, unlike a hostile working environment, need not involve physical and/or verbal harassment." *Id.* n. 6. Thus, this case does not hold or imply that hostile environment is not a species of intentional discrimination. The language is fully consistent with the analysis of hostile environment as involving intentional discrimination but not requiring separate additional proof of the element of intent. The second case which could be interpreted as contradicting the Court's present analysis is *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991), a Title VII hostile environment case involving co-worker sexual harassment which contains the following language:

Title VII is not a fault-based scheme. "Title VII is aimed at the consequences or effects of an employment practice and not at the ... motivation" of co-workers or employers. *Rogers [v. EEOC*, 454 F.2d 234,] 239 [ (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) ]; *see also Griggs v. Duke Power*

*Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (the absence of discriminatory intent does not redeem an otherwise unlawful employment practice).

*Id.*, 924 F.2d at 880. This language cannot be read as broadly as it first appears to be written. Its apparent suggestion that no Title VII claim requires discriminatory intent would be completely inconsistent with the well-established elements of disparate treatment claims under Title VII. Even with respect to hostile environment claims, this language is more limited than it appears. To understand its meaning, it is necessary to examine the area of the hostile environment test that the Ninth Circuit was addressing in making this point.

As noted above, there are three segregable elements of the hostile environment test. First, the plaintiff must be subject to unwelcome harassment based on her membership in a protected group. Second, the harassment must be sufficiently severe or pervasive to create an abusive environment. Third, the employer must know or be on notice of the hostile environment and fail to take appropriate remedial action. The first element contains an intent requirement with respect to the harasser, and the third element contains an intent requirement with respect to the employer. However, the second element does not relate to intent at all; it relates only to the injury.

The above-quoted language in *Ellison* appears in the context of the court's discussion of the second element, the one element not related to intent. In particular, the court was addressing the question of what standard to use in measuring the severity and pervasiveness of the harassment. Wishing to avoid exposing employers to liability based on "the idiosyncratic concerns of the rare hyper-sensitive employee," the Ninth Circuit chose not to measure the extent of harassment based solely on the employee's subjective experience of it. *Id.* at 879. On the other hand, the court declined to use a "sex-blind reasonable person standard" on the grounds that such a standard "tends to be male-biased and tends to systematically ignore the experiences of women." *Id.* The court noted that:

Sexual harassment is a major problem in the workplace. Adopting the victim's perspective ensures that courts will not "sustain ingrained notions of reasonable behavior fashioned by the offenders." Congress did not enact Title VII to codify prevailing sexist prejudices. To the contrary, "Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation which serve to close or discourage employment opportunities for women."

*Id.* at 880–81 (footnote and citations omitted). The court therefore adopted a "reasonable woman" standard, holding that "a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Id.* at 879. It was in this context that the *Ellison* court noted that the victim-based standard could result in a finding of severe and pervasive harassment even though the harassers themselves are too insensitive to realize that their conduct creates a hostile environment. *Id.* The court discounted this problem because Title VII is not a "fault-based scheme." *Id.* at 880.

Seen in its correct context, the discussion in *Ellison* is not inconsistent with viewing hostile environment as a species of "disparate treatment" or "intentional discrimination." This discussion relates solely to the issue of when an environment is sufficiently hostile to satisfy that element of a claim of violation of Title VII. To the extent that it relates to the intent requirement, it simply demonstrates that the first element does not require that the harasser intend his conduct to harass, but only that the harasser intend to select the recipient of his conduct on the basis of her gender, that is, to engage in disparate treatment based on sex. Notably, this discussion does not relate to the element of entity culpability at all.

The *Ellison* court's discussion of this point is also useful in comparing the workplace and the schoolhouse. The court supported its point that sexual harassment is a "major problem in the workplace" with statistics that

over 40% of female federal employees reported incidents of sexual harassment in 1987 and in 1980. This statistic pales in comparison to the statistics regarding harassment in school. Celia B. Fisher, Ph.D., one of Defendants' experts, cites findings of a 1993 study by the American Association of University Women Educational Foundation that 85% of girls and 76% of boys report having been the victim of unwanted sexual comments or touching in school. Exhibit B to Declaration of Scott N. Kivel. Similarly, Jeffrey N. Younggren, Ph.D., another of Defendants' experts, opines that sexual harassment is not only very common among junior-high-aged students, but indeed "developmentally correct" in that population.

Thus it appears that school districts are on notice that student-to-student sexual harassment is very likely in their schools, particularly in junior high school. In light of this knowledge, if a school district fails to develop and implement policies reasonably designed to bring incidents of severe or pervasive harassment to the attention of the appropriate officials, it must be inferred that the district intended the inevitable result of that failure, that is, a hostile environment. Thus the Title VII standard for intentional discrimination, which imposes liability where the entity knows or should have known of the hostile environment and fails to take remedial action, is the appropriate standard.

Defendants argue that application of the Title VII standard, without the addition of a separate intent requirement on the part of the entity, will improperly require the schools to create a harassment-free environment, a task which is impossible in any population, and particularly in a population of adolescents. Defendants are incorrect regarding the scope of the Title VII standard. It is not a strict liability standard, making entities responsible for every incident of harassment in the environment over which the entity exercises control. The Title VII standard disallows strict liability of entities for conduct of third parties in three ways. First, the plaintiff must prove that gender-based harassment was so severe or pervasive as to create a hostile environment that adversely affected the plaintiff's ability to func-

tion in the environment; thus, an entity cannot be liable for sporadic or minor incidents. Second, the plaintiff must prove that the entity actually knew, or should in the exercise of its legal duties have known, of the harassment. Third, even if a hostile environment exists, and the entity has actual or constructive notice of it, the entity is not liable if it takes prompt, appropriate remedial action; this standard leaves room, therefore, for the court to allow schools an appropriate amount of discretion in determining how best to respond to harassment.

Defendants also argue that public policy weighs against imposition of damages on school districts for student-to-student harassment, absent discriminatory animus on the part of the district's agents, because school districts would be unfairly caught between their obligation to avoid infringing the freedom of speech of the harassers and their duty to prevent harassment of the victim. This argument is not persuasive.

The school First Amendment cases cited by Defendants uniformly recognize that a student's freedom of expression is limited both by other students' rights and by the school's right and duty to maintain order. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 512–13, 89 S.Ct. 733, 739–40, 21 L.Ed.2d 731 (1969) (students entitled to express personal views unless expression will "substantially interfere with the work of the school or impinge upon the rights of other students"); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (same); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986) (school may censor speech which would not be subject to censorship outside of school environment where the speech is inconsistent with the school's "basic educational mission"). *Fraser* explicitly recognized that a school must be permitted to "disassociate itself" from improper "sexually explicit" speech to demonstrate that such speech is "wholly inconsistent with the 'fundamental values' of public school education." 478 U.S. at 685–86, 106 S.Ct. at 3165.

Thus, the First Amendment cases not only permit schools, but specifically recognize a duty on the part of schools, to regulate the speech of their students in a manner consis-

tent with proper education. The Office of Civil Rights has found, in an agency interpretation of Title VI and in Letters of Finding with respect to Title IX, that this duty extends to taking appropriate action to prevent student-to-student harassment. As the OCR stated in its agency interpretation, "the unique setting and mission of an educational institution" imposes a special duty of care in this regard:

> In addition to the curriculum, students learn about many different aspects of human life and interaction from school. The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students.

Dep't of Educ., *Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance*, 59 Fed.Reg. 11448 (Mar. 10, 1994). Therefore, public policy in fact supports imposition of a duty to take reasonable steps to prevent or terminate student-to-student harassment, enforceable in actions for compensatory damages. Further, public policy supports application to such claims of the traditional hostile environment framework developed in Title VII cases to prove the existence of, and entity liability for, intentional discrimination.

*CONCLUSION*

For the reasons stated above, Plaintiff's motion for reconsideration of this Court's interlocutory order of August 30, 1993 is GRANTED. The Court holds that the standard applicable to this action is the traditional Title VII hostile environment standard. Thus, the elements which Plaintiff must prove are that Plaintiff was subjected to unwelcome harassment based on her gender, that the harassment was so severe or pervasive as to create a hostile educational environment, and that the Defendants knew, or should in the exercise of their duties have known, of the hostile environment and failed to take prompt and appropriate remedial action.

IT IS SO ORDERED.