**NICOLE K., By and Through her parents and natural guardians, PETER K. and Cathy K.**

v.

**UPPER PERKIOMEN SCHOOL DISTRICT and Don Pisker, individually and in his capacity as a public school teacher at the Upper Perkiomen Middle School.**

Civil Action No. 97–1112.

United States District Court, E.D. Pennsylvania.

May 22, 1997.

Philip Matthew Stinson, Sr., O'Brien & O'Brien Associates, P.C., Wynnewood, PA, for Plaintiff.

Kenneth A. Roos, Wisler, Pearlstine, Talone, Craig, Garrity & Potash, Blue Bell, PA, Jeffrey H. Quinn, Duffy and Quinn, Philadelphia, PA, for Defendants.

### MEMORANDUM

BARTLE, District Judge.

Plaintiff Nicole K., a student in the Upper Perkiomen School District ("UPSD"), brings this suit under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*, as well as under 42 U.S.C. § 1983 and state law. She claims that one of her teachers, defendant Don Pisker ("Pisker"), as well as students in the UPSD, insulted her while defendant UPSD idly stood by. Defendants move to dismiss the federal claims in plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and her pendent state law claims for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules.[1]

A complaint should be dismissed pursuant to Rule 12(b)(6) only where "it is clear that no relief could be granted under any set of

---

1. Defendants actually moved to dismiss plaintiff's First Amended Complaint. However, pursuant to an Order of this court entered on May 1, 1997, we will consider that motion as a motion to dismiss the Second Amended Complaint.

facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). All well pleaded factual allegations in the complaint are assumed to be true and viewed in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969).

The facts alleged in plaintiff's Second Amended Complaint, accepted as true, are as follows. Plaintiff currently is a seventh grade student enrolled at Upper Perkiomen Middle School in the UPSD. In February, 1997, plaintiff enrolled in a Geography class taught by defendant Pisker. As Pisker took the roll call on the first day of class, he asked plaintiff the origin of her last name. She responded that her name was German and that her father moved to the United States from Germany as a child. Pisker exclaimed: "Oh, we have a Neo Nazi in our class!" Pisker repeatedly referred to plaintiff as "the German girl" during the remainder of that first class and told her that "Germans make good farmers." Although plaintiff's parents complained to the assistant principal about Pisker's behavior the next day, no remedial action was or has been taken. Students have taken up Pisker's charge, referring to Nicole as a "Nazi" on a daily basis at school and calling her at home with similar taunts. Nicole apparently is "depressed, agitated, irritable, afraid, and undesirous of attending school." Second Amended Complaint, ¶ 13.

## I.

Plaintiff first asserts that the defendants have violated her educational rights under 20 U.S.C. § 1681 *et seq.*, commonly known as "Title IX." Title IX provides, in pertinent part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . . [2]

2. UPSD does not dispute that it receives federal assistance.

3. Pisker would not be liable under any of these theories. Indeed, the only count in plaintiff's

20 U.S.C. § 1681(a). It is well-established that Title IX is enforceable through an implied private right of action. *Cannon v. University of Chicago*, 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560 (1979). This right of action includes a claim against a school district for money damages where a teacher sexually harasses a student or, in some circumstances, where students sexually harass other students. *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 75, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992); *Collier v. William Penn Sch. Dist.*, 956 F.Supp. 1209 (E.D.Pa.1997). However, Title IX is inapplicable to the present case. Pisker allegedly called plaintiff a "Neo Nazi," the "German girl," and declared that "Germans make good farmers." Students in the UPSD refer to plaintiff as a Nazi. It is apparent that any discrimination plaintiff has suffered does not stem from her sex. Her Title IX claim fails.

## II.

We now turn to plaintiff's second federal cause of action, brought under 42 U.S.C. § 1983. Section 1983 states that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or proper proceeding for redress.

As clarified by her brief in response to defendants' motion to dismiss, plaintiff has three alternative bases for her § 1983 claim: (1) she was subject to a hostile school environment in the UPSD; (2) UPSD had and has a policy or custom of insulting female middle school students based on their ethnic heritage; and (3) UPSD owed and breached a special duty to plaintiff to protect her from Pisker's actions.[3]

Second Amended Complaint which seemingly targets Pisker is the following:

In calling Nicole K. a "Neo Nazi" and the "German Girl," and by telling Nicole that

Plaintiff first asserts that a "hostile educational environment" based on gender and national origin permeates the UPSD. However, as explained in our Title IX discussion, it is evident that plaintiff has not stated a valid claim for gender discrimination. Therefore, the sole issue for resolution is whether plaintiff has made out a case under § 1983 for a hostile educational environment based on national origin discrimination.

■ We first pause to note some reservation in labelling the pertinent behavior in this case "national origin" or "ethnic" discrimination. As the United States Supreme Court has noted, "the term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). Plaintiff was born in Doylestown, Pennsylvania. When Pisker referred to plaintiff as "the German girl," then, he was not referring to the country where she was born but targeting "the country from which ... her [father] came." *Id.* Similarly, Pisker acknowledged plaintiff's heritage through his "Germans make good farmers" declaration. We do not see how these statements can possibly give rise to a § 1983 action.

That brings us to Pisker's "Neo Nazi" remark, and the taunting of "Nazi" which plaintiff allegedly endured and continues to endure from other students. Calling a young child, or anyone for that matter, a "Neo Nazi" or a "Nazi" is surely cruel (assuming it is not true). It may even be slanderous. However, we are not certain that such comments are directed at a person's "national origin." The historical definition of "Nazi" is "a member of the National Socialist German Workers' party," a political party founded in the aftermath of World War I. The word "Nazi" itself is simply derived from the pronunciation of the first two syllables of the

German word "National." New Webster's Dictionary and Thesaurus of the English Language, p. 668 (1993). "Neo" Nazi refers to someone associated with a "later revival of" the Nazi party. *Id.* at 670. In either case, a "Nazi" is an individual who aligns him or herself with the ideas and principles of the National Socialist German Workers' party. Without question, the Nazi party was heavily concentrated in Germany prior to and during World War II. However, its ideology was widespread, with adherents residing in many other nations. After World War II, Germany enacted a series of laws aimed at eradicating Nazism and preventing its resurgence. *See* David E. Weiss, *Striking A Difficult Balance: Combatting the Threat of Neonazism in Germany While Preserving Individual Liberties*, 27 Vand. J. Transnat'l L. 899, 921–24 (1994). For example, German Basic Law provides that "[political] parties which do not conform with democratic principles are unconstitutional." *Id.* at 901. Despite these efforts and the defeat of the Third Reich, contemporary "Neo Nazis" have taken root throughout the globe. Many reside in this country. *See, e.g.*, Marc Fisher and Steve Coil, *Hate Groups: An International Cooperative*, Washington Post, May 11, 1995, at A31. In short, while plaintiff naturally took offense when cries of "Nazi" or "Neo Nazi" were hurled in her direction, these statements were not necessarily aimed at "the country where [she] was born, or, more broadly, the country from which ... her ancestors came." *Espinoza*, 414 U.S. at 88, 94 S.Ct. at 336. The words "Nazi" and "Neo Nazi," in an accurate sense, today refer to a reviled and feared political ideology once centered in Germany but now an unfortunate presence in many countries—including our own.

With that caveat in mind, we assume for purposes of discussion that the scorn endured by plaintiff constituted "national ori-

---

"German's [sic] make good farmers," defendants were motivated by evil motive and intent; were reckless; wanton; and acted in a manner of deliberate indifference to plaintiff's rights to the safeguards of liberty, due process, and equal protection.

Obviously, "defendants" in this context can only refer to Pisker, as Pisker, not the UPSD, actually

made the statements in question. Even so, there is no basis under federal law for holding Pisker liable. As discussed *infra*, defamation alone does not provide a cause of action under § 1983. *Paul v. Davis*, 424 U.S. 693, 695, 96 S.Ct. 1155, 1157–58, 47 L.Ed.2d 405 (1976).

gin" harassment. We now must determine whether plaintiff has pleaded a cause of action under § 1983 for a hostile educational environment based on that intolerance. Defendants correctly note that no court has recognized such a claim. Plaintiff's response, in its entirety, follows:

> 3. In her Second Amended Complaint, plaintiff properly pleads the necessary elements of a violation of 42 U.S.C. § 1983 for a hostile school environment, as the well-pled elements of an analogous Title VII hostile environment claim properly determine the threshold of a cause of action under Title IX. *Collier v. William Penn. Sch. Dist.*, No. 96–7765, slip. op. [956 F.Supp. 1209] (E.D.Pa. Feb. 28, 1997).

> 4. Therefore, plaintiff's § 1983 cause of action is well-pled, as the Second Amended Complaint includes all of the necessary elements of an analogous Title VII hostile work environment claim pursuant to *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996); *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 862–63 (3d Cir.1990); and *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990).

This discussion fails to clarify the precise basis for plaintiff's cause of action. We remain skeptical that § 1983 encompasses a claim for a "hostile educational environment" based on national origin discrimination. Claims for a "hostile educational environment" based on sexual harassment have been upheld under Title IX, not § 1983. *See, e.g., Franklin*, 503 U.S. at 75, 112 S.Ct. at 1037–38; *Collier*, 956 F.Supp. at 1214; *Doe v. Petaluma City Sch. Dist.*, 949 F.Supp. 1415 (N.D.Cal.1996); *Burrow By and Through Burrow v. Postville Community Sch. Dist.*, 929 F.Supp. 1193, 1205 (N.D.Iowa 1996). *But see Parks v. Wilson*, 872 F.Supp. 1467 (D.S.C.1995). This makes sense. Title IX specifically targets gender discrimination in education. By contrast, § 1983 is not directly aimed at eradicating national origin discrimination in our public schools.

▮ Assuming, without deciding, that § 1983 authorizes plaintiff's averred cause of action, we agree with the position taken by both plaintiff and defendants that the framework of a Title VII hostile work environment claim should apply. To sustain a claim for a hostile educational environment based on national origin, then, a plaintiff would have to demonstrate that:

> (1) she suffered intentional discrimination because of her national origin;

> (2) the discrimination was pervasive and regular;

> (3) the discrimination detrimentally affected the plaintiff;

> (4) the discrimination would detrimentally affect a reasonable student of the same national origin in her position; and

> (5) respondeat superior liability exists.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990). Plaintiff has not pleaded this cause of action. There are no allegations in her Second Amended Complaint which suggest that she suffered "pervasive and regular" national origin discrimination from the defendants. *Id.* Pisker's derogatory comments toward plaintiff spanned only one day. As the Court of Appeals for the Third Circuit noted in an analogous situation:

> [t]wo comments [ ] are insufficient, in and of themselves, to support a hostile environment claim. Hostile environment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere.

*Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir.1990). The only potential "pervasive and regular" harassment indicated by plaintiff's Second Amended Complaint is the following:

> classmates of [plaintiff] [ ] *bombarded* [plaintiff] with derogatory comments relating to Nazis *for months* after the harassment by Pisker began.

Second Amended Complaint, ¶ 22 (emphasis added). However, plaintiff's reliance on § 1983 as a cause of action now places her in an intractable situation. Under § 1983, a school district is not liable for the actions of its students. *See D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1368–76 (3d Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122

L.Ed.2d 354 (1993); *Collier*, 956 F.Supp. at 1215. Therefore, UPSD cannot be held responsible when students harangue plaintiff with cries of "Nazi." Plaintiff's hostile educational environment claim fails at the pleading stage.

■ Plaintiff next asserts that UPSD violated § 1983 because it maintained "a policy, practice, or custom, of insulting school girls and otherwise depriving them of the [sic] constitutional [sic] protected rights because of their ethnic background...." Second Amended Complaint, ¶ 24. Plaintiff does not suggest that this was a formal institutional policy of UPSD. Nonetheless:

> an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Board of County Commissioners of Bryan County v. Brown*, — U.S. —, —, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626, — (1997), citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). However, as the Supreme Court cautioned:

> [t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably.

*Brown*, — U.S. at —, 117 S.Ct. at 1389. Instead, the plaintiff must demonstrate that the municipality was the "moving force" behind the injury alleged. *Id.* at —, 117 S.Ct. at 1388.

■ Assuming all well pleaded factual allegations to be true and viewing them in the light most favorable to the plaintiff, *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969), we cannot find that plaintiff has pleaded a "policy or custom" of UPSD which violated her federal rights. The entirety of plaintiff's allegations regarding UPSD's "policy" of insulting school girls because of their ethnic background are: (1) Pisker insulted Nicole K. because of her German heritage during one class; (2) Pisker insulted a student named Elaina K. because of her Russian background on one other occasion; and (3) Pisker has a "long history of intimidating middle school female students because of their ethnic heritage." Second Amended Complaint, ¶ 14. The remaining accusations in plaintiff's Second Amended Complaint—that Pisker referred to an African–American student (gender not noted) as "monkey lips," that he made a crack about the *religion* of a female student named Katie McG., and that another teacher, Mrs. Reinhart, insulted a *male* student—do not support plaintiff's claim. Second Amended Complaint, ¶¶ 15–17. Plaintiff would infer a municipal policy from two alleged incidents involving one teacher and a nebulous charge that the same teacher has a "history" of similar incidents. We decline to do so. Plaintiff has not sufficiently alleged that UPSD has a practice of insulting school girls because of their ethnic background which is "so widespread as to have the force of law." *Brown*, — U.S. at —, 117 S.Ct. at 1388. She "simply ha[s] shown that the employee [Pisker] acted culpably," not that the municipal entity was a "moving force" behind her injuries. *Id.* In sum, plaintiff's § 1983 claim cannot rest on charges of an unconstitutional policy or custom in the UPSD.

■ Finally, plaintiff argues that UPSD is liable under § 1983 because it had a "special and affirmative duty pursuant to the Fourteenth Amendment" to protect her from the actions of Pisker and failed to do so. Second Amended Complaint, ¶ 26. She suggests that this special duty arises because she "is required to attend school under Pennsylvania law." *Id.* at ¶ 27. Although plaintiff does not pinpoint a particular clause of the Fourteenth Amendment implicated by this duty, the "special relationship" test customarily applies as a due process analysis. *See, e.g., Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996). Construing plaintiff's Second Amended Complaint so as to do substantial justice, *see* Fed.R.Civ.P. 8(f), we surmise that she similarly intends to invoke the due process clause.

■ However, plaintiff fails to complete the equation. She does not explain what due

process right UPSD may have infringed. None is apparent. "[T]he Due Process Clause of the Fourteenth Amendment confers both substantive and procedural rights." *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994). There is no allegation that UPSD denied plaintiff a hearing, a property interest, or otherwise disobeyed traditional notions of procedural due process. *See Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978). Nor did UPSD deny plaintiff some unequivocal right to "substantive" due process of law; that entitlement "for the most part [has] been accorded to matters relating to marriage, family, procreation, and bodily integrity." *Albright,* 510 U.S. at 272, 114 S.Ct. at 812. The United States Supreme Court "has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in the unchartered area are scarce and open-ended." *Id.* at 271–72, 114 S.Ct. at 812 (quotation omitted). In a particularly germane decision, the Court explicitly determined that defamation of an individual, "standing alone and apart from any other governmental action with respect to him," does not state a claim for relief under the due process clause or § 1983. *Paul v. Davis,* 424 U.S. 693, 695, 96 S.Ct. 1155, 1157–58, 47 L.Ed.2d 405 (1976). The Court explained:

> [t]he words "liberty" and "property" as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law ... reputation alone, apart from some more tangible interests such as employment, [is not] ... sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701, 96 S.Ct. at 1160–61; *accord Kulwicki v. Dawson,* 969 F.2d 1454, 1468 (3d Cir.1992).[4]

■ Courts interpreting *Paul,* including the Court of Appeals for the Third Circuit,

have taken its "apart from" clause as a signal that "defamation [may be] actionable under § 1983[ ] if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Township of Falls,* 890 F.2d 611, 619 (3d Cir.1989). This concept is referred to as the "reputation-plus" or "stigma-plus" requirement, although "[w]hat satisfies that 'plus' ... is uncertain." *Ersek v. Township of Springfield,* 102 F.3d 79, 83 n. 5 (3d Cir.1997). At a minimum, "plus" entails a significant alteration in plaintiff's status or the extinguishing of plaintiff's rights. *Paul,* 424 U.S. at 711, 96 S.Ct. at 1165. In practice, only termination from government employment clearly meets the standard. *Id.* at 701, 96 S.Ct. at 1160–61; *Campbell v. Pierce County,* 741 F.2d 1342, 1344 (11th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). Having one's name placed on a blacklist does not suffice. *Cameo Convalescent Center, Inc. v. Senn,* 738 F.2d 836, 843 (7th Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 780, 83 L.Ed.2d 775 (1985). Financial harm does not suffice. *Sturm v. Clark,* 835 F.2d 1009, 1012–13 (3d Cir.1987). Loss of future employment or business opportunities does not suffice. *Clark v. Township of Falls,* 890 F.2d at 620. In fact, at least one Court of Appeals has held that "damage to [a plaintiff's] employment *must* have resulted" before a § 1983 claim can rest on a defamation charge. *Johnson v. Morris,* 903 F.2d 996, 999 (4th Cir.1990) (emphasis added).

We are aware that in a case decided before *Paul, Goss v. Lopez,* 419 U.S. 565, 574–78, 95 S.Ct. 729, 736–38, 42 L.Ed.2d 725 (1975), the Supreme Court held that charges of misconduct which damaged a student's reputation and resulted in his suspension from school could trigger the procedural guarantees of the Fourteenth Amendment. However, as the Supreme Court emphasized in *Paul,* it was the act of suspension, not the defamatory accusations of misconduct, which affected the student's state-created right to attend

---

4. The Court here refers to the concept of a liberty interest in reputation as implicating procedural due process. However, some courts have referred to it in more substantive terms. *See, e.g.,*

*Ersek v. Township of Springfield,* 102 F.3d 79, 83, n. 5 (3d Cir.1997); *WMX Technologies, Inc. v. Miller,* 80 F.3d 1315, 1318–20 (9th Cir.1996).

school. *Paul,* 424 U.S. at 710, 96 S.Ct. at 1164–65.

Plaintiff has not been suspended from school. She has not been expelled. She has not been removed from Pisker's class. Obviously, she has not been terminated from a government job. In short, plaintiff has made no allegation that Pisker's potentially defamatory statements somehow changed her status at Upper Perkiomen Middle School or altered a right which she previously held. *Id.* at 711, 96 S.Ct. at 1165. Plaintiff merely alleges that Pisker made unfavorable statements about her during her first day of class. Her claim is "nothing more than a state defamation action masquerading as a Section 1983 claim." *Garner v. Township of Wrightstown,* 819 F.Supp. 435, 442 (E.D.Pa.), *aff'd,* 16 F.3d 403 (3d Cir.1993).

Plaintiff's § 1983 claim will be dismissed.

### III.

The final three counts of plaintiff's Second Amended Complaint allege "negligent and intentional failure to comply with the Pennsylvania Constitution," slander, and "tortious interference." These tort claims comprise the heart of plaintiff's case. Having dismissed plaintiff's federal claims, and lacking diversity jurisdiction, we decline to exercise our supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). We dismiss plaintiff's state law claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.