Doe v. Londonderry School Dist.     CV-95-469-JD  06/13/97  P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Jane Doe, et al.

       v.                              Civil No. 95-469-JD

Londonderry School District

O R D E R

The plaintiffs, Jane Doe, Mother Doe, and Father Doe,[1]

brought this action under Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681 ("Title IX"), and 42 U.S.C. § 1983,

against the Londonderry School District (the "District").  Before

the court are the District's motions to dismiss (document no. 11)

and for summary judgment (document no. 12).

Background[2]

During the summer of 1993, Jane, then age 13, became close

friends with three boys from her school, John Johnson, James

---

   The court uses pseudonyms to protect the identities of the
minors involved in this action.

   The facts in this case are intricate and hotly disputed.
The court notes that its ability to gain a clear picture of the
facts has been hindered not only by the disputes between the
parties and the cursory factual recitations of the legal
memoranda, but also by internal inconsistencies within each
party's proffered materials.  The court's recitation of the facts
is for background purposes only, with key areas of dispute
highlighted.  Most disputes center on (1) the precise dates and
sequence of certain events; (2) the substance of conversations
between the plaintiffs and District employees; or (3) the
knowledge and motivation of individuals at particular times.  As
it must, the court views all genuinely disputed material facts in
the light most favorable to the plaintiffs, the parties resisting
summary judgment.  See Sanchez v. Alvarado, 101 F.3d 223, 225 n.1
(1st Cir. 1996).  However, the court need not accept any party's
"conclusory allegations, improbable inferences, [or] unsupported
speculation."  Rivera-Cotto v. Rivera, 38 F.3d 611, 613 (1st Cir.
1994).

Jamison, and Joe Jones.  Jane began seventh grade at the Londonderry Junior High School ("LJHS") in September 1993. During the fall of the 1993-94 school year, James and Joe asked Jane to go out with them.  Jane declined, saying that she did not wish to do anything that would hurt their friendship.  However, she did go out with a fourth boy, Jack Jackson, who was a mutual friend of all parties.

In about the third week of September 1993, after Jane started dating Jack, James and Joe started to harass Jane.  They barked and howled at her as frequently as several times each day, and on one occasion one of them gave her a dog biscuit.  They also called her, among other things, a "slut," a "whore," and a "fucking bitch."  The verbal behavior escalated from whispers to shouts, eventually taking place when others were present.  The boys also encouraged others to join in the harassment.

Jane confronted the boys about their behavior.  They only laughed and continued taunting her.  Around the fourth week of September, Jane met with her school guidance counselor, Katherine Ciak.  Jane told Ciak about the problems she was having with the boys, and Ciak presented her with two options for dealing with the harassment:  (1) referring the boys to LJHS Vice Principal Neil Elliot for discipline; or (2) having Ciak speak to the boys to educate them about sexual harassment and give them a strong

warning to stop. At Jane's request, Ciak talked to the boys. Although they promised Ciak that they would stop calling Jane names, they increased their harassment of Jane and threatened to retaliate against her if she made any more reports about their behavior. Ciak did not inform Mother and Father Doe of Jane's harassment during September.[3]

Because Jane thought going out with Jack might have caused the harassment to begin, she broke up with Jack.[4] However, James and Joe continued to harass her and Jack joined in. The harassment continued to escalate, and began to include physical contact. The boys pushed Jane into lockers and down the stairs, knocked her books from her hands, and spat on her. The record does not clearly indicate either when such physical contact began

---

Ciak's appointment calendar and statements show that Jane and Ciak met, at a minimum, on the following dates of the 1993-94 school year: October 14, November 2, November 19, December 10, December 21, January 12, January 26, and February 7. The parties dispute the subject matter of those meetings. While admitting that she met with Jane throughout the fall, Ciak claims that the first meeting in which Jane told her about the harassment was on January 12, 1994. According to Ciak, on January 26, 1994, after the boys had promised Ciak that they would stop harassing Jane, Ciak asked Jane if the boys had stopped harassing her and Jane told Ciak that they had. Ciak further claims that she did not find out until February that the harassment actually continued after her interventions.

Despite asserting that she broke up with Jack after James and Joe started harassing her, Jane has also represented that she was not harassed by any of the boys until after she and Jack broke up.

3

or its frequency. Jane began to take precautions to avoid the boys in the halls at school. In addition, from late-September on, Jane began to receive two to three abusive telephone calls per week at home. At first, the caller or callers would simply hang up, but eventually male voices began to threaten Jane and call her names such as "bitch," "slut," and "fucking whore."

Jane met with Ciak a second time during mid-October 1993, and again asked her to do something to stop the harassment. The only help she received during that and numerous subsequent meetings with Ciak was being told to "stay away from" or "ignore" the boys. The harassment continued to escalate.

During mid-October 1993, Jane informed Mother Doe about the fact that she was being harassed. Jane begged Mother not to intervene because previous intervention had only worsened the situation. On one occasion, Father overheard a conversation between Jane and Mother about the harassment and became aware that Jane was being harassed.

In early- to mid-November 1993, Mother Doe met with Ciak. Mother asked why Mother and Father had not been contacted earlier about the ongoing harassment of Jane and Ciak responded that she was "taking care of it." Father Aff. ¶ 7.

By December 1993, Jane was deeply depressed, not eating well, not sleeping well, crying frequently, spending time alone

4

in her room, losing interest in sports, and losing the ability to concentrate on her academics. In mid-December 1993, Jane got in a fight with a girl on the school bus. The girl had been calling Jane such things as a "slut" and a "fucking whore" for some time, and Jane punched her in the mouth in response. The girl's mother complained to Vice Principal Elliot, who scheduled a meeting with the girls and their parents. After the meeting, Ciak, who also attended but did not actively participate, informed Father that she was "staying on top of" the continuing harassment of Jane. Father Aff. ¶ 13. Father asked, "What does staying on top of it mean if it's still continuing?," but he did not receive a satisfactory answer. Father became convinced that Ciak did not fully understand the seriousness of Jane's complaints of sexual harassment.

During late-January or early-February 1994, Jane was handed a pornographic cartoon depicting her being anally penetrated by one of the boys.[5] Jane began crying and went to the table where James, Joe, and Jack were sitting because she felt that they were responsible. They only laughed at her accusations. Jane left and went to Ciak's office. Ciak told her to take the drawing to

---

[5] Jane's complaint places this episode before the lunchroom incidents described infra. According to Ciak, however, this incident happened on February 10, 1994, after the lunchroom incidents.

Elliot.  Jane did, and Elliot conducted an investigation but was unable to find out who had drawn the cartoon.

After school, Jane informed Mother about the cartoon. Mother immediately went to the school to pick up the cartoon and called the school the next day to ask how they planned to handle the situation.  Mother Doe spoke to LJHS Principal Nancy Meyers, who had no knowledge of the incident.  Meyers informed Mother that she would find out who did know about the situation and call back with the information.  Meyers spoke to Elliot and called back.  She told Mother that she had spoken to Elliot and that he had conducted an investigation but had not been able to identify the responsible party.  Meyers told Mother that the incident would not be reported to the school district superintendent, A.J. Ouillette, Jr., and that such conduct was normal behavior for children in Jane's age group.[6]

On February 7, 1994, an incident happened while Jane was at lunch.  Mother had suggested a way for Jane to attempt to handle the continued harassment and provided her with a bowl.  At lunch, Jane filled the bowl with milk, took it to the table where James was sitting, and left it for him saying that if he was going to

Mother alleges, and Meyers denies, that Meyers told Mother that Meyers wanted Mother to drop Jane's complaints of harassment.

6

be catty he could drink milk from the bowl. In response, James threw a piece of meat at Jane upon which he had placed a sexual lubricant. The meat struck Jane in the shoulder. Jane picked up the meat, at which point James knocked it from her hand and into Ciak.[7] Ciak told Jane to go to the principal's office, but Jane refused because she felt that she was not at fault. Jane was reprimanded and given a demerit for failing to follow Ciak's orders, despite the fact that Ciak allegedly knew or should have known that the incident was a result of the continued harassment of Jane by the boys. Jane believes that James was not punished or reprimanded for his role in the incident, but has been hampered in her effort to demonstrate this assertion by the District's apparent policy of destroying disciplinary records at the end of each school year.[8]

The next day at lunch, Jane again presented James with a bowl of milk. Someone, possibly James, tripped Jane, spilling some of the milk. Ciak instructed Jane to clean it up, but Jane refused and was again disciplined. Jane's parents were not pleased that Jane was disciplined for these incidents and

---

Ciak alleges that Jane attempted to throw the meat back at James but missed James and hit her instead.

Elliot asserts that James was punished.

7

contacted the school requesting that she not be further disciplined. Ciak arranged a meeting with Mother and Jane at which they discussed the harassment issue and Ciak showed the Does a book on handling sexual harassment. Jane was not disciplined further.

Mother Doe eventually attempted to contact Superintendent Ouillette directly for assistance, but Ouillette did not respond personally. Instead, on Tuesday, February 15, 1994, Meyers returned the call on Ouillette's behalf. According to Mother, Meyers indicated to Mother that the matter should be dropped. On Wednesday, February 16, Meyers spoke to Jane. Jane reported that only Joe was still harassing her. James had stopped the week before, after Elliot claims to have disciplined him, and Jack had stopped several months before. Jane also allegedly admitted that she had made inappropriate verbal responses, such as name calling, in response to the harassment. Meyers told Jane that she would speak to the boys again to let them know that sexual harassment was serious and that they must cease their inappropriate behavior immediately or face serious disciplinary action up to and including suspension. Meyers also told Jane to report immediately if any of the boys continued to harass her. Meyers spoke to James and Joe that day, addressing not only the harassment at school but also the calls that Jane was receiving at home.

8

Meyers called Mother to explain what she had done. That night, despite Meyers' intervention, Jane received another harassing call from Joe. Mother called Meyers the following morning and they discussed options, including both the possibility of Meyers having another conversation with Joe and of Mother reporting the matter to the police. Meyers did talk to Joe again, and he admitted that he made the call. Because Jane was upset by the call, her parents let her stay out of school that day and the next, which were the Thursday and Friday prior to her February vacation.

By the February vacation of 1994, Jane was so depressed by what was happening at school that she threatened to run away. She had also begun to contemplate suicide. During February vacation, Jane refused to return to LJHS and Mother and Father Doe decided to remove her. Jane was eventually enrolled in a private school, where she completed her junior high education.

Despite her attendance at a private school, Jane continued to receive threatening phone calls at home throughout the 1993-94 school year, over the summer, and during the fall semester of the 1994-95 school year. In the fall of 1994, Jane was contacted by a friend from LJHS who told her that her name was brought up and discussed in a sexual harassment awareness class being taught for the first time that year. The class "debated whether [Jane] was

9

actually victimized or not." Jane Aff. ¶ 36. Jane did not like this and that information plus the continued phone calls exacerbated her depression. Jane did not like to spend time outside her house because the boys were still in the neighborhood and she would see them as she came and went.

Although enrollment in a private school initially resulted in an improvement in Jane's academic performance, by December 1994, Jane's grades had again dropped. Her semester report card included C's. Father was unhappy with Jane's performance when he saw the report card, which upset Jane. She locked herself in her room and later that afternoon attempted suicide by overdosing on medication from the medicine cabinet. Jane was hospitalized as a result and has undergone counseling. Jane feels "betrayed by the Londonderry Jr. High School administrators and the Londonderry School District." Jane Aff. ¶ 41.

When Mother and Father removed Jane from LJHS, they also filed a complaint with the New Hampshire Department of Education, who referred her to the United States Department of Education's Office for Civil Rights ("OCR") in Boston. At OCR, Mother spoke with Robert Lynch. After several discussions, Lynch informed Mother and Father that their complaint was "not frivolous" and warranted a full investigation by OCR. As a result of OCR's investigation, the boys who had harassed Jane wrote letters of

apology for their conduct. After the OCR investigation, in June or July of 1994, Mother and Father received a letter from OCR stating that it had reached a satisfactory resolution with the District and was closing its investigation.

The resolution involved the District entering into a voluntary compliance agreement ("VCA"). Prior to the agreement, the District was not in compliance with OCR requirements, inter alia, because the school did not have the following: (1) a formal Title IX policy and procedure; (2) a Title IX coordinator; or (3) a Title IX grievance procedure. The VCA required the District to institute a Title IX sexual harassment policy and program that met with OCR's approval.

In September 1994, Mother and Father received a letter from the District informing them that the District was willing to provide six months of counseling to Jane at district facilities, contingent on Mother and Father releasing the District of liability for the harassment. Mother and Father refused the offer because they felt it was both insensitive and inadequate. After Jane graduated from the private junior high school in June 1995, the Doe family moved away from Londonderry to get a new start because of continued harassment of Jane and her brother.

On September 29, 1995, the plaintiffs brought this action. In count I, they allege that the District condoned or failed to

11

prevent a sexually harassing hostile environment in violation of Title IX.  In count II, the plaintiffs allege that they are entitled to punitive damages.  In count III, the plaintiffs allege that the District violated 42 U.S.C. § 1983 by the conduct complained of in count I.  In count III.A.,[9] the plaintiffs assert that the District is liable for negligent supervision.  In count IV, the plaintiffs assert that the District is liable for negligent infliction of emotional distress.  In count V, the plaintiffs assert that the District is liable for enhanced compensatory damages on the state law claims.

## Discussion

Defendant District has filed motions to dismiss and for summary judgment, asserting, inter alia, that: Title IX does not create an action against a school district for peer sexual harassment; the plaintiffs have not provided sufficient evidence to establish that the District intentionally failed to curtail the harassment; punitive damages are not available against the District under Title IX; and, the plaintiffs have not established § 1983 liability by demonstrating that the District violated a

---

The plaintiffs' complaint lists two counts labeled as "Count III."  The court will refer to the second "Count III" as "Count III.A."

constitutionally protected right of Jane.

The District moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  However, because the District has already filed an answer to the plaintiffs' complaint, the pleadings have closed under Fed. R. Civ. P. 7(a).  As such, the court will treat the defendant's motion to dismiss as a motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(c).

The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as the standard for evaluating a Rule 12(b)(6) motion.  Republic Steel Corp. v. Pennsylvania Eng'g Corp., 785 F.2d 174, 182 (7th Cir. 1986).  In both cases, the court's inquiry is a limited one, focusing not on "whether a plaintiff will ultimately prevail but whether [he or she] is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (motion to dismiss under Fed. R. Civ. P. 12(b)(6)).  In making its inquiry, the court must accept all of the factual averments contained in the complaint as true, and draw every reasonable inference in favor of the plaintiffs.  Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992) (Rule 12(b)(6) motion); Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991) (Rule 12(c) motion).  In the end, the court may not enter

13

judgment on the pleadings unless it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his or her claim which would entitle him or her to relief.'" Santiago de Castro, 943 F.2d at 130 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); see also Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988).

The role of summary judgment, on the other hand, is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of establishing the lack of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiffs, "'indulging all reasonable inferences in [their]

14

favor.'" <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendant has submitted a properly supported motion for summary judgment, the plaintiffs "may not rest upon mere allegation or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

I.    <u>The Title IX Peer Sexual Harassment Claim</u>

Title IX provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C.A. § 1681 (West 1990). Under Title IX, an educational entity receiving federal funds may be held liable if attendees suffer discriminatory treatment. <u>See</u> <u>Lipsett v. University of P.R.</u>, 864 F.2d 881, 897, 901 (1st Cir. 1988) (discriminatory treatment by supervisor in mixed employment-training context). The Supreme Court has held than an implied private right of action exists for violations of Title IX. <u>See</u> <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 717 (1979). It has also held that monetary damages are available for intentional

15

violations of Title IX's provisions.  See Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 74-75 (1992).

This case, however, presents an issue undecided by either the Supreme Court or this Circuit:  whether and to what extent school districts can be found liable under Title IX for peer sexual harassment, i.e., the sexual harassment of one student by another.

Several other federal courts have considered this issue. See Seamons v. Snow, 84 F.3d 1226 (10th Cir. 1996); Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir. 1996), cert. denied, 117 S. Ct. 165 (1997); Davis v. Monroe County Bd. of Educ., 74 F.3d 1186 (11th Cir. 1996), vacated & reh'g en banc granted, 91 F.3d 1418 (11th Cir. 1996); Piwonka ex rel. Piwonka v. Tidehaven Indep. Sch. Dist., ___ F. Supp. ___, 1997 WL 189270 (S.D. Tex. Apr. 15, 1997); Collier ex rel. Collier v. William Penn Sch. Dist., 956 F. Supp. 1209 (E.D. Pa. 1997); Franks v. Kentucky Sch. for the Deaf, 956 F. Supp. 741 (E.D. Ky. 1996); Doe ex rel. Doe v. Petaluma City Sch. Dist., 949 F. Supp. 1415 (N.D. Cal. 1996); Wright ex rel. Wright v. Mason City Community Sch. Dist., 940 F. Supp. 1412 (N.D. Iowa 1996); Linson v. Trustees of the Univ. of Pa., No. 95-3681, 1996 WL 479532 (E.D. Pa. Aug. 21, 1996); Bruneau ex rel. Schofield v. South Kortright Cent. Sch. Dist., 935 F. Supp. 162 (N.D.N.Y. 1996); Burrow ex rel. Burrow v.

16

<u>Postville Community Sch. Dist.</u>, 929 F. Supp. 1193 (N.D. Iowa 1996); <u>Bosley v. Kearney R-1 Sch. Dist.</u>, 904 F. Supp. 1006 (W.D. Mo. 1995); <u>Oona R.-S. ex rel. Kate S. v. Santa Rosa City Schs.</u>, 890 F. Supp. 1452 (N.D. Cal. 1995); <u>Garza v. Galena Park Indep. Sch. Dist.</u>, 914 F. Supp. 1437 (S.D. Tex. 1994). Nearly all courts to have considered the issue have concluded that, under some conditions, school districts may be liable for failing to respond to a hostile educational environment created by peer sexual harassment. <u>See, e.g.</u>, <u>Seamons</u>, 84 F.3d at 1232; <u>Rowinsky</u>, 80 F.3d at 1016; <u>Wright</u>, 940 F. Supp. at 1420; <u>Bruneau</u>, 935 F. Supp. at 174; <u>see also</u> <u>Garza</u>, 914 F. Supp. at 1438 (finding no Title IX cause of action for peer sexual harassment, but effectively overruled by <u>Rowinsky</u>). However, the standards for establishing liability vary from court to court. <u>Compare</u> <u>Rowinsky</u>, 80 F.3d at 1016, <u>with</u> <u>Davis</u>, 74 F.3d at 1194-95. In determining what the appropriate standard for liability is in a Title IX claim for peer sexual harassment, the court will review and weigh the policies and approaches considered by other courts that have addressed the issue.

A.   <u>The Rule 12 Motion</u>

In support of its motion to dismiss, the defendant argues (1) that peer sexual harassment is not actionable under Title IX;

17

and (2) that the plaintiffs have not alleged that the defendant intentionally discriminated against the plaintiff on the basis of sex.

The Supreme Court has provided little guidance with respect to interpreting the scope of Title IX other than the general admonition that it is to be given "a sweep as broad as its language." North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 521 (1982). Furthermore, the legislative history of Title IX provides no direct guidance for applying it in the context of peer sexual harassment.[10] See Lipsett, 864 F.2d at 896-97 (discussing employment-related legislative history). Courts have frequently used Title VII principles in interpreting Title IX. See, e.g., id.

The Supreme Court recognized a cause of action for "hostile work environment" sexual harassment under Title VII in Meritor Sav. Bank v. Vinson. 477 U.S. 57, 73 (1986). In at least one

---

As one federal court considering the issue of peer sexual harassment has noted, "[g]iven the enormous social implications for students, schools, and parents, this court wishes that Congress would step in and simply tell us whether it intended to make school districts responsible for the payment of damages to students [in the peer harassment context]. Knowing that that will not occur, the court does its best to decipher Congressional intent." Wright, 940 F. Supp. at 1414. This court urges Congress to carry out its legislative responsibilities and to address these issues squarely so that policy will be made where it should be made -- in Congress -- and not by default in the courts.

18

case of a student-employee who was harassed, the First Circuit has concluded that Title VII principles apply to Title IX cases. See Lipsett, 864 F.2d at 896-97. However, in that case the Circuit explicitly limited its ruling to the facts before it and gave no indication that its analysis could be extended to other Title IX cases absent an employer-employee relationship. See id. at 897 ("[O]ur present holding . . . is limited to the context of employment discrimination. . . . We have no difficulty extending the Title VII standard to discriminatory treatment by a supervisor in this mixed employment-training context."). Several courts in other circuits have adapted the hostile work environment framework for use in Title IX cases. See, e.g., Wright, 940 F. Supp. 1416-17; Bruneau, 935 F. Supp. at 174.

Also relevant to the court's consideration is OCR's interpretation of Title IX. See Cohen v. Brown Univ., 991 F.2d 888, 895 (1st Cir. 1993) (courts "must accord [OCR's] interpretation of Title IX appreciable deference"). OCR has determined that peer sexual harassment violates Title IX, and that a school district can violate Title IX by failing to take reasonable steps to curtail peer sexual harassment. See, e.g., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (1997) (final policy guidance)

19

[hereinafter OCR, Peer Harassment Guidance].  According to OCR, "a school will be liable under Title IX if its students sexually harass other students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action."  Id. at 12,039.

The sound policy reasons for extending Title IX liability to the peer sexual harassment context have been adequately discussed in other cases and will not be reiterated here.  See, e.g., Rowinsky, 80 F.3d at 1012-16; Collier, 956 F. Supp. at 1213; Bruneau, 935 F. Supp. at 172; Burrow, 929 F. Supp. at 1204-05; Bosley, 904 F. Supp. at 1021-23.  The equally sound reasons for tailoring the applicable standard for liability to the unique circumstances present in the Title IX context have also been ably explicated.  See, e.g., Rowinsky, 80 F.3d at 1024-25 (Dennis, J., dissenting); Cohen, 991 F.2d at 900-01; Bosley, 904 F. Supp. at 1023.  Therefore, the court looks to Title VII principles for guidance, but adopts a flexible approach sensitive to the differences between the peer sexual harassment and employment contexts.

Although the courts that have considered this issue have applied different standards, these standards can be grouped into three basic approaches.  The most rigorous approach has been

adopted by the Fifth Circuit in <u>Rowinsky</u>.  In <u>Rowinsky</u>, the Fifth

Circuit held that:

> In the case of peer sexual harassment, a plaintiff must
> demonstrate that the school district responded to
> sexual harassment claims differently based on sex.
> Thus, a school district might violate Title IX if it
> treated sexual harassment of boys more seriously than
> sexual harassment of girls, or even if it turned a
> blind eye toward sexual harassment of girls while
> addressing assaults that harmed boys.

<u>Rowinsky</u>, 80 F.3d at 1016 (5th Cir. 1996).

A more moderate approach has been adopted by other courts.

For example, in <u>Bosley</u>, the court held that:

> [T]he elements of a claim against a school district for
> student-on-student sexual harassment in any educational
> program or activity receiving federal financial
> assistance are: (1) the plaintiff was subjected to
> unwelcome sexual harassment; (2) the harassment was
> based on sex; (3) the harassment occurred during the
> plaintiff's participation in an educational program or
> activity receiving federal financial assistance; and
> (4) the school district knew of the harassment and
> intentionally failed to take proper remedial action.

<u>Bosley</u>, 904 F. Supp. at 1023.  In <u>Wright</u>, the court endorsed the

following test:

> A plaintiff must prove (1) that the plaintiff is a
> member of a protected group; (2) that the plaintiff was
> subject to unwelcome sexual harassment; (3) that the
> harassment was based on sex; (4) that the harassment
> was sufficiently severe or pervasive that it altered
> the conditions of the plaintiff's education and created
> an abusive educational environment; and (5) that the
> education institution knew of the harassment and
> <u>intentionally</u> failed to take the proper remedial
> measures because of the plaintiff's sex.

21

*Wright*, 940 F. Supp. at 1420. In *Seamons*, the Tenth Circuit held that:

> The elements [the plaintiff] must prove to succeed on a claim of sexual harassment are: (1) that [she] is a member of a protected group; (2) that [she] was subject to unwelcome harassment; (3) that the harassment was based on sex; (4) that the sexual harassment was sufficiently severe or pervasive so as unreasonably to alter the conditions of [her] education and create an abusive educational environment; and (5) that some basis for institutional liability has been established.

*Seamons*, 84 F.3d at 1232.

The most expansive test articulated is typified by the approach initially adopted, but since withdrawn, by the Eleventh Circuit in *Davis*. The *Davis* court's position on notice is what differentiates it from other cases that use similar language. In *Davis*, the Eleventh Circuit adopted the following test:

> The elements a plaintiff must prove to succeed in this type of sexual harassment case are: (1) that she is a member of a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and (5) that some basis for institutional liability has been established.

*Davis*, 74 F.3d at 1194. The court noted that institutional liability could be established by either actual or constructive notice. *See* *id.* In *Petaluma*, the court took a similar approach, holding that:

> [T]he standard applicable to this action is the

22

> traditional Title VII hostile environment standard.
> Thus, the elements which Plaintiff must prove are that
> Plaintiff was subjected to unwelcome harassment based
> on her gender, that the harassment was so severe or
> pervasive as to create a hostile educational
> environment, and that the Defendants knew, or should in
> the exercise of their duties have known, of the hostile
> environment and failed to take prompt and appropriate
> remedial action.

Petaluma, 949 F. Supp. at 1427.[11]

The court rejects the District's contention that peer sexual harassment is never actionable against a school district under Title IX.[12] Having considered Congress's intent with respect to Title IX, the case law developing Title IX, OCR's regulations

---

The Davis court is one of few courts and the only Circuit court to have embraced the constructive notice standard for peer sexual harassment liability. However, in the Davis case the court found that the defendant had actual notice of the harassment, so the part of the opinion referring to constructive notice is dicta. Furthermore, the Eleventh Circuit vacated the Davis opinion pending decision after a rehearing en banc, so that no Circuit court currently recognizes a constructive notice theory for peer sexual harassment. In this case, the court need not decide the issue of the effect of constructive notice, because the plaintiffs claim that the District had actual notice and have not argued that any events prior to Jane informing Ciak of the harassment served to give the District constructive notice.

The court notes, however, that Mother and Father Doe are not proper plaintiffs to bring this cause of action in their individual capacities because, as the plaintiffs have acknowledged, they are not students at an educational institution receiving federal funds. See Burrow, 929 F. Supp. at 1199; Bosley, 904 F. Supp. at 1020. Therefore, the court grants the District's Rule 12 motion with respect to Mother and Father Doe's Title IX claims and considers only Jane's claim.

regarding peer sexual harassment, and the approaches of the other courts to consider this issue, the court is persuaded that, under some circumstances, a school district's failure to curtail peer sexual harassment may be actionable under Title IX. The court holds that Jane must show the following factors to prevail on her Title IX claim: (1) the plaintiff was a student in an educational program or activity receiving federal financial assistance within the coverage of Title IX, see, e.g., Bosley, 904 F. Supp. at 1023; (2) the plaintiff was subjected to unwelcome sexual harassment while a participant in the program, see, e.g., Bosley, 904 F. Supp. at 1023; (3) the harassment was sufficiently severe or pervasive that it altered the conditions of the plaintiff's education and created a hostile or abusive educational environment, see, e.g., Seamons, 84 F.3d at 1232; Wright, 940 F. Supp. at 1420; and (4) the school district knew of the harassment and intentionally failed to take proper remedial action, see, e.g., Wright, 940 F. Supp. at 1420; Bosley, 904 F. Supp. at 1023. The court finds that this standard, comparable to the moderate approaches discussed supra that have been adopted by other courts, best resolves the competing concerns relevant to school district liability under Title IX in the peer sexual harassment context.

The requirement that a Title IX violation be "intentional"

24

has generated some disagreement among courts.[13]  Several courts have simply chosen not to define specifically what is required to show an intentional violation.  <u>See, e.g.</u>, <u>Collier</u>, 956 F. Supp. at 1214.  Other courts have stated merely that, to be intentional, the wrongful conduct must be "on the basis of sex." <u>See</u> <u>Wright</u>, 940 F. Supp. at 1419-20; <u>Bosley</u>, 904 F. Supp. at 1023, 1025.  The <u>Rowinsky</u> court has interpreted the intentionality requirement to mean that the district must have treated complaints by girls differently than complaints by boys. <u>See</u> 80 F.3d at 1016.  However, the <u>Rowinsky</u> approach has been sharply criticized by other courts.  <u>See, e.g.</u>, <u>Petaluma</u>, 949 F. Supp. at 1421 ("<u>Rowinsky</u> is manifestly based on a fundamental misunderstanding of the nature of this type of claim.").  This court is persuaded by the reasoning of those courts that have interpreted this requirement to mean that, to be held liable, a school district must have intended <u>to create a hostile educational environment for the plaintiff</u>.  <u>See</u> <u>Petaluma</u>, 949 F. Supp. at 1426; <u>see also</u> <u>Burrow</u>, 929 F. Supp. at 1205.[14]  In the

---

As already noted <u>supra</u>, a minority of courts has determined that the intent requirement may be satisfied by either actual or constructive knowledge.

Having reached this conclusion, the court rejects the District's argument that Jane's allegations fail to adequately state a claim of intentional discrimination sufficient to survive the defendant's Rule 12 motion.  Jane's claim that the District knew of the harassment and failed to stop it states a claim from which a reasonable factfinder could conclude that the District intended to create a hostile educational environment for Jane.

25

court's judgment, such an approach best advances Congress's goal of providing a meaningful remedy for a school district's intentional failure to provide a safe, non-hostile, and non-discriminatory educational environment while not exposing the public fisc to limitless monetary liability for the uncondoned acts of students.

The court grants the District's Rule 12 motion with respect to the Title IX claims of Mother and Father Doe but denies the District's motion with respect to Jane's Title IX claim.

B.    The Summary Judgment Motion

The court next considers the District's motion for summary judgment on Jane's Title IX claim.  In support of its motion for summary judgment, the defendant argues that Jane has failed to offer any facts from which a reasonable factfinder could conclude that the defendant intentionally discriminated against Jane.  The District urges that, at most, its failure to act was negligent.[15]

---

The District argues that the response to Jane's complaints of harassment was appropriate and suggests that discipline of the harassers was hampered, inter alia, by Jane's provision of incomplete and inconsistent versions of events.  Because of the existence of genuine disputes of material fact about what the District knew, when it obtained that knowledge, and what actions it took in response, the court is unable to grant summary judgment on these issues.

The court notes that the District focuses its challenge exclusively on the fourth prong of the test, the requirement that Jane show that the school district knew of the harassment and intentionally failed to take proper remedial action. In response, Jane argues that she has submitted sufficient evidence from which a reasonable jury could infer that the District failed to act to protect her with the intention of creating a hostile educational environment. She argues that, from the time she first informed Ciak of the harassment in October 1993 until her parents were forced to withdraw her in February, the school did nothing to curb the harassment and instead disciplined Jane while allowing the harassers to go unpunished.

Jane has produced, inter alia, the following evidence in support of her claim: (1) the District knew in late September, through Ciak, that Jane was being sexually harassed by the boys and by February had still failed to stop the harassment; (2) Ciak failed to understand and pass on information about the seriousness of the harassment despite numerous complaints by Jane and her parents; (3) District employees disciplined Jane for conduct that was her way of attempting to stop the harassment; (4) Meyers expressed the attitude that "boys will be boys" and

that much of what was happening was normal behavior; and (5) the District was not in compliance with OCR's Title IX requirements at the time of the harassment, including not having a Title IX policy or a designated Title IX coordinator. Taking that evidence in the light most favorable to Jane, the court concludes that she has adduced sufficient evidence in support of her claim to raise a genuine issue of material fact for trial on the question of whether the District's failure to stop the harassment of Jane amounted to an intent to create a hostile educational environment for her. Therefore, the court denies summary judgment on Jane's Title IX claim in count I.[16]

## II.  Available Damages

As part of its Rule 12 motion, the defendant argues that the plaintiffs have not alleged sufficient facts to support an award of punitive damages for a violation of Title IX. The plaintiffs argue that the issue of punitive damages in Title IX cases has

---

The standard for liability that the court has adopted cabins Jane's surviving claim. The District cannot be held liable for all of the acts of harassment Jane has alleged. For example, harassing telephone calls Jane received at home after she was no longer a student at LJHS cannot result in liability for the District. Similarly, the fact that Jane was discussed in sexual harassment awareness classes after her departure from LJHS is irrelevant to her Title IX claim. A fortiori, Jane cannot recover damages, if any, resulting from such acts. See infra Part II.

not been decided, and that the court need not and should not decide it at this time because this area of the law is rapidly evolving. The plaintiffs also urge that even if Mother and Father are not proper plaintiffs under the Title IX claim, Jane should be allowed to recover funds for schooling and medical care expended by them on Jane's behalf.

Generally, punitive damages are not recoverable against municipalities or municipal subdivisions absent express statutory authority. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 260 n.21 (1981). The Supreme Court has held, for example, that punitive damages are not available against a municipality under § 1983. See id. at 271. Title IX contains no statutory authority for awarding a punitive damage award against a municipality. See 20 U.S.C.A. § 1681 (West 1990). Title VII, to which courts often refer in interpreting Title IX, expressly excludes municipalities from its authorization for punitive damages. See 42 U.S.C.A. § 1981a(b)(1) (West 1994) ("A complaining party may recover punitive damages under this section against a respondent (other than a government, governmental agency or political subdivision) . . . ."). Therefore, the court holds that punitive damages are not available against municipalities under Title IX. See also Collier, 956 F. Supp. at 1217. Because public school districts are considered municipal

29

entities, see Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 705, 707 (1989), it follows that the plaintiffs will not be able to recover punitive damages against the District under the plaintiffs' Title IX theory.

The court accepts, in principle, the plaintiffs' argument that Jane should be able to recover funds expended by her parents on Jane's behalf for damages resulting directly from the District's actionable behavior. This conclusion means, however, that compensatory damages are available only for injuries that Jane establishes are the direct result of sexual harassment for which the District was responsible due to its failure to provide Jane with a non-hostile educational environment. See supra note 18. Thus, Jane will not be able to recover, inter alia, for damages caused by harassment suffered before the District had notice that the boys' harassment had created a hostile educational environment for her or for damages suffered after she withdrew from LJHS.

III. The Section 1983 Claims

In support of its motion for summary judgment, the defendant argues that the plaintiffs have failed to provide any evidence from which a reasonable fact finder could conclude that the

30

defendant deprived Jane[17] of a constitutionally protected right.[18] The plaintiffs argue that, despite the fact that most federal courts have rejected § 1983 claims in the context of peer sexual harassment, they have produced sufficient evidence to proceed on either a state-created danger or a special-relationship theory. In support of this, the plaintiffs make two specific claims: (1)

---

The court notes that Mother and Father have not alleged that any constitutionally protected right of either of them has been violated. The District's allegedly wrongful conduct pertains exclusively to Jane. See Soto v. Flores, 103 F.3d 1056, 1062 (1st Cir. 1997) (mother whose children were killed "was not deprived of a constitutionally protected interest" and could not bring § 1983 claim on her own behalf).

In support of its Rule 12 motion on the plaintiffs' § 1983 claims, the defendant argues that the plaintiffs have failed to properly allege that the defendant deprived them of a constitutionally protected right. Because the court has before it the summary judgment motion and a fully developed factual record, it need not decide, as other courts have done, the issue of whether peer sexual harassment can ever state a claim upon which relief can be granted. See, e.g., Collier, 956 F. Supp. at 1214-16 (rejecting state-created danger theory under § 1983 for this cause of action); Bosley, 904 F. Supp. at 1019 (finding no DeShaney exception applicable to peer sexual harassment); Bruneau, 935 F. Supp. at 178-79 (N.D.N.Y. 1996) (Title IX supplants § 1983 recovery for peer sexual harassment). But see Oona R.-S., 890 F. Supp. 1452 (defendants did not satisfy burden of showing that Congress intended Title IX to supplant § 1983 remedy). The court assumes without deciding that a § 1983 claim may be brought against a school district for conduct that is also actionable under Title IX, and considers the merits of the plaintiffs' § 1983 claim. In doing so, the court focuses on the question of whether the District deprived Jane of a constitutionally protected right because the plaintiffs have not argued that their § 1983 claim is based on a violation of Title IX or another right protected by federal statute.

31

that Ciak spoke to the perpetrators of the harassment, which caused the harassment to increase; and (2) that the District had a special relationship with its students, giving rise to a duty to prevent the harassment. The plaintiffs also argue that the District had a discriminatory policy or custom of failing to train employees and students that amounted to deliberate indifference to the rights of female students. Lastly, they assert that they have stated a claim for a violation of Jane's equal protection rights. The court evaluates these arguments seriatim.

First, the court rejects the plaintiffs' assertion that the mere fact that Ciak's contact with the perpetrators resulted in increased harassment of Jane amounted to a violation of Jane's constitutionally protected rights. Although in DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989), the Supreme Court recognized that a state actor could be held liable under § 1983 for acting affirmatively to increase the risk of harm to an individual, in this case it is undisputed that Ciak spoke to the boys at Jane's request and that she attempted to get them to cease the harassment. The plaintiff has adduced no evidence to establish that speaking to the boys was an inappropriate or unreasonable way to attempt to curtail the harassment. Therefore, no reasonable factfinder could conclude

that Ciak's act of speaking to the boys rose to the level of a due process violation.

Second, the court rejects the plaintiffs' assertion that the District owed Jane a duty to protect her from the boys' harassment, the failure of which amounted to a violation of Jane's constitutionally protected rights.  In DeShaney, the Supreme Court also noted that inaction by a state actor could give rise to § 1983 liability when the state takes a person into custody and holds her there against her will, making her so unable to care for herself that the state must do so.  See id. at 199-200; Bosley, 904 F. Supp. at 1017-18.  However, the plaintiffs have not produced any competent evidence to raise a genuine issue of material fact in support of the claim that the District took Jane into custody and made her unable to care for herself.  Therefore, no reasonable factfinder could conclude that the District owed Jane a duty of constitutional magnitude to prevent her from being sexually harassed.

Third, the court rejects the plaintiffs' assertion that the District's failure to train employees and students about sexual harassment constituted discrimination on the basis of sex.  The plaintiffs have urged that "[w]hen school officials are deliberately indifferent to a need for training, the lack of training may be considered a policy or custom subjecting the school to liability."  However, the plaintiffs have not developed

33

this bare assertion either by providing legal support for it or by producing evidence from which a reasonable factfinder could conclude that the District was deliberately indifferent to a need for training. See OCR, Peer Harassment Guidance, 62 Fed. Reg. at 12038 (school districts not required to have specific sexual harassment policy and procedure as long as non-discrimination policies and procedures are effective in eliminating sex discrimination).

Finally, the plaintiffs argue that they have adduced sufficient evidence to proceed on an equal protection theory. To prevail on an equal protection claim, the plaintiffs must show that the District treated Jane's complaints differently than the complaints of boys. See, e.g., Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997). To sustain such a claim, the plaintiffs must show, at a minimum, that the District treated the complaints of boys differently than the complaints of girls "'because of,' not merely 'in spite of,'" the harmful effect that such treatment would have. See id. (citing Personnel Adm'r v. Feeney, 442 U.S. 256, 279 (1979)). As the plaintiffs have not produced any evidence regarding the way the school district treated the complaints of boys, there is no basis from which a reasonable factfinder could conclude either (1) that the District had a

34

custom or policy of treating the complaints of boys differently than the complaints of girls; or (2) that it treated girls' complaints differently because of the adverse impact it would have on them.[19] Thus, the court finds that the defendant is entitled to summary judgment on the plaintiffs' § 1983 claim for violation of Jane's equal protection rights.

For the above reasons, the court grants the defendant's motion for summary judgment as to the plaintiffs' § 1983 claim in count III.

IV. <u>State Law Claims</u>

The defendant urges the court not to exercise supplemental jurisdiction over the plaintiffs' state law claims. However, having determined that Jane has a viable claim under Title IX that warrants a trial, the court chooses to exercise jurisdiction over Jane's state law claims of negligent infliction of emotional distress and negligent supervision. In addition, the court will exercise its pendent party supplemental jurisdiction over Mother and Father Doe's state law claims. <u>See</u> 28 U.S.C.A. § 1367(a)

---

The plaintiffs urge that "The Complaint raises issues of equal protection insofar as it describes disparate treatment between girls and boys." However, merely raising an issue sufficient to survive a motion to dismiss, which the plaintiffs arguably have done, does not suffice to meet their burden on summary judgment, which they have failed to do.

35

(West 1993) ("[S]upplemental jurisdiction shall include claims that involve the joinder . . . of additional parties."). Because the District has not sought summary judgment on the substance of these claims, the court expresses no opinion on their merits.

## Conclusion

For the reasons stated above, the defendant's Rule 12 motion (document no. 11) is granted in part and denied in part. The defendant's motion for summary judgment (document no. 12) is granted in part and denied in part. The court will exercise supplemental jurisdiction over the plaintiffs' state law claims.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

June 12, 1997

cc:  Charles Douglas, Esquire
     Donald E. Gardner, Esquire